UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION



FILED
DEC 19 2007

*********************************************************************

|  |  |  |
|---|---|---|
| YANKTON SIOUX TRIBE, and its individual members, | * * * | CIV 98-4042 |
|  | * |  |
| Plaintiffs, | * |  |
|  | * |  |
| UNITED STATES OF AMERICA, on its own behalf and for the benefit of the Yankton Sioux Tribe, | * * * | MEMORANDUM OPINION AND ORDER |
|  | * |  |
| Plaintiff-Intervenor, | * |  |
|  | * |  |
| -vs- | * |  |
|  | * |  |
| SCOTT PODHRADSKY, States Attorney of Charles Mix County, et al., | * * | |
|  | * |  |
| Defendants. | * |  |
|  | * |  |

*********************************************************************

This case is on remand from the Eighth Circuit Court of Appeals.[1]  A trial to the Court was held on November 13 and 14, 2007.  For the reasons set forth below, the Court finds the following

---

[1]When this case was remanded by the Eighth Circuit, it was a consolidated action with *Yankton Sioux Tribe v. Southern Missouri Waste Mgmt. Dist.*, CIV 94-4217 (D.S.D.), and both cases were remanded.  Although the Court has not dismissed Southern Missouri Waste Management District ("Southern Missouri") as a party to this litigation, it appears from the record that Southern Missouri is no longer taking an active role in this litigation.  Southern Missouri filed a Statement On Issues Remaining After Remand, Doc. 197, on June 28, 2004, and counsel for Southern Missouri, Kenneth Cotton, appeared at a hearing held by the Court in this case on October 14, 2004, *see* Doc. 222.  Thereafter, Southern Missouri has made no appearances by counsel and has filed nothing additional with the Court.  Mr. Cotton continues to receive notice of entry of the Court's Orders in this case from the Clerk of Court and he is still listed as counsel of record for Southern Missouri on the Court's docket.  During the Court trial in this action in November 2007, the Court observed Southern Missouri's counsel, Kenneth Cotton, in the audience and he made no attempt to make an appearance for Southern Missouri or object to the trial being conducted without Southern Missouri's participation.  Southern Missouri is bound by this decision.

categories of land within the original 1858 treaty boundaries of the Yankton Sioux Reservation remain part of the reservation and are Indian country under 18 U.S.C. § 1151(a): (a) land reserved to the federal government in the Act of Aug. 15, 1894, Ch. 290, 28 Stat. 286, 314-19, and then returned to the Yankton Sioux Tribe; (b) land allotted to individual Indians that remains held in trust; (c) land taken into trust under the Indian Reorganization Act of 1934, ch. 576, 48 Stat. 984 (1934) (codified as amended at 25 U.S.C. §§ 461-77); and (d) Indian owned fee land that has continuously been held in Indian hands.

## I. BACKGROUND

It must be decided on remand what remains of the Yankton Sioux Reservation following the Supreme Court's decision in *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 358 (1998) ("*Yankton Sioux Tribe*"), holding that the reservation had been diminished, and the Eighth Circuit's decision in *Yankton Sioux Tribe v. Gaffey*, 188 F.3d 1010, 1030 (8th Cir. 1999) ("*Gaffey II*"). The Supreme Court held that the Yankton Sioux Reservation was diminished by the land ceded to the United States by the Yankton Sioux Tribe at the end of the nineteenth century. *See Yankton Sioux Tribe*, 522 U.S. at 358. The issue of whether the Yankton Sioux Reservation was disestablished, however, was not addressed by the Supreme Court, and the case was remanded for further proceedings. *Id.* On remand, this Court held that the Yankton Sioux Reservation was not disestablished, that all nonceded lands continued to be part of the reservation, and that all nonceded lands were subject to federal criminal jurisdiction. *See Yankton Sioux Tribe v. Gaffey*, 14 F.Supp.2d 1135 (D.S.D. 1998) ("*Gaffey*"). On appeal, the Eighth Circuit affirmed this Court's decision that the Yankton Sioux Reservation was not disestablished, but found that the reservation was "further diminished by the loss of those lands originally allotted to tribal members which have passed out of Indian hands." *Gaffey II*, 188 F.3d at 1030. Those lands are no longer "part of the Yankton Sioux Reservation and are no longer Indian country within the meaning of 18 U.S.C. § 1151." *Id.* In *Gaffey II*, the Eighth Circuit made clear that it was faced with considering "the undetermined current status of the 262,000 acres originally allotted to tribal members, some of which remain in trust, but the bulk of which have lost their trust status and are owned in fee by non Indians." 188 F.3d at 1017. Further, the Eighth Circuit explained that, "[t]he question here is one of jurisdiction, that is to what

extent the Tribe retains jurisdiction over any nonceded land within the original reservation boundaries." *Id.* It should be reconfirmed that this case involves jurisdiction issues and does not affect title to real estate.

Regarding the boundary issue, the Eighth Circuit held that, "the original exterior treaty boundaries of the reservation have not been maintained." *Gaffey II*, 188 F.3d at 1030. The Eighth Circuit found that, "[t]he text of the 1894 Act and evidence regarding the parties' contemporaneous understanding of it establish that the reservation was maintained, but do not define its precise boundaries. When viewed in its full historical context, however, it is clear that the parties did not intend for the tribe to retain control over allotted lands which passed out of trust status and into non Indian hands." *Gaffey II*, 188 F.3d at 1030.

Addressing land now owned in fee by individual Indians, the Eighth Circuit assumed that such land "is not under tribal jurisdiction unless it is found to be 'within the limits of [the] Indian reservation.'" *Id.* (quoting 18 U.S.C. § 1151(a)). Based upon the record before the Eighth Circuit, however, it was unable to define the precise boundaries of what remains of the Yankton Sioux Reservation. *Id.* Accordingly, on remand the Court is required to develop a further record and determine what the boundaries are of the Yankton Sioux Reservation. Contrary to the position of the Tribe, no one line can circumscribe what remains of the Yankton Sioux Reservation. Also, contrary to the position of the Defendants, the Yankton Sioux Reservation does exist.

Prior to the trial, the Court in 2006 set forth in a Memorandum Opinion and Order the issues that would be considered on remand. (Memorandum Opinion and Order, Doc. 223.) In that decision, the Court determined the following issues are to be decided in this remand proceeding: (1) Whether the boundaries of the Yankton Sioux Reservation were frozen by the enactment of 25 U.S.C. § 398d, which the Tribe refers to as "the 1927 Act"; (2) If the boundaries of the Yankton Sioux Reservation were not frozen by the 1927 Act, were the boundaries frozen by the Indian Reorganization Act, Ch. 576, 48 Stat. 984 (1934) (codified as amended at 25 U.S.C. §§ 461-77), referred to as "the 1934 Act", such that all lands alienated to non-Indians after 1934 and prior to the

3

1948 Supervised Sales Act, 25 U.S.C. § 483, are within the boundaries of the Yankton Sioux Reservation; (3) What lands are currently trust lands; (4) Are the trust lands "Indian country" under 18 U.S.C. § 1151(a)[2] or § 1151(c)[3]; and (5) What is the reservation status of nonceded fee lands *to the extent that* such status has not been decided by the appellate courts.

Defendants' primary arguments are that the Court should find the Yankton Sioux Reservation has been disestablished, that there are no remaining boundaries of the reservation and that no lands within the former reservation constitute "reservation" under 18 U.S.C. § 1151(a). They contend none of the individual categories of land identified by the courts or the parties constitute "reservation" under 18 U.S.C. § 1151(a). Contrary to the United States' position, Defendants contend each individual parcel of land taken into trust does not become a discrete "reservation" under 18 U.S.C. § 1151(a), with its own boundaries, and each piece of allotted land does not have such "reservation boundaries." Defendants argue the Tribe's position that the northern 1858 boundary is gone but that the southern 1858 boundary remains is untenable. Set forth immediately below are more specific arguments advanced by Defendants in support of their general arguments described above.

Defendants argue there are no "reservation" boundaries as that term is defined under 18 U.S.C. § 1151(a), because the reservation has been disestablished and Congress has not created new boundaries. Congress' failure to create new boundaries results in the Yankton Sioux Reservation

---

[2]18 U.S.C. § 1151(a) provides as follows:
Except as otherwise provided in section 1154 and 1156 of [Title 18], the term "Indian country", as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation ....

[3]118 U.S.C. § 1151(c) provides as follows:
Except as otherwise provided in section 1154 and 1156 of [Title 18], the term "Indian country", as used in this chapter, means ... (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

having no boundaries and the Courts lack the power to themselves create such boundaries, according to Defendants.  Next, Defendants argue the South Dakota Supreme Court's determination in *Bruguier v. Class*, 599 N.W.2d 364 (S.D. 1999), that the Yankton Sioux Reservation has been disestablished, is correct.  In a similar vein, Defendants argue the Eighth Circuit's determination that the Yankton Sioux Reservation has not been disestablished is inconsistent with the Supreme Court's decision in *DeCoteau v. District County Court*, 420 U.S. 425 (1975).  The law of this case is that the Yankton Sioux Reservation has been diminished and not disestablished.  *DeCoteau* is distinguishable and does not control nor affect this controversy.  The Tribe and the Defendants were advised prior to the Court trial that their respective positions that there was no diminishment and that there was disestablishment would not be revisited in this trial.  (Order, Doc. 399, Nov. 8, 2007.)

Addressing claims raised by the Tribe following the remand, the Defendants argue 25 U.S.C. § 398d, or the "1927 Act", did not freeze the boundaries of the Yankton Sioux Reservation as of 1927.  First, Defendants contend the Tribe waived this argument by not raising it earlier in this litigation and is barred by the issuance of the mandate by the Eighth Circuit and the law of the case doctrine.  Second, Defendants contend the 1927 Act does not apply to the Yankton Sioux Reservation because that Act applies only to executive order reservations, not to reservations created by treaty, as was the Yankton Sioux Reservation.  Finally, Defendants maintain that even if the Court determines the 1927 Act could apply to treaty reservations, the Act did not "freeze" the boundaries of the Yankton Sioux Reservation because the intent of the 1927 Act was to impose limits on the authority of the President to enlarge or contract reservation boundaries.  The 1927 Act was not intended to limit the ability of Congress to continue the policy of former acts it passed, such as the 1894 Act by which Congress intended to increase jurisdiction of the State of South Dakota on the Yankton Sioux Reservation as white settlers came on to the opened lands.  Act of Aug. 15, 1894, ch. 290, 28 Stat. 286, 314-19 ("1894 Act"); *see Gaffey II*, 188 F.3d at 1028 (explaining that the 1894 Act "intended to diminish the reservation by not only the ceded lands, but also by the land which it foresaw would pass into the hands of the white settlers and homesteaders.").

5

Another claim of frozen boundaries advanced by the Tribe is under 25 U.S.C. §§ 462 and 464, which was referred to above as "the 1934 Act". Defendants counter the Tribe's arguments by claiming the Tribe has waived this argument and it is prohibited by the Eighth Circuit's mandate in this case, as well as by the law of the case doctrine. The second argument advanced by Defendants is that the 1934 Act was optional for Indian tribes and, thus, the intent of Congress could not have been to "freeze" reservation boundaries. In addition, Defendants argue the legislative history and text of the 1934 Act do not support the Tribe's claim of "freezing" reservation boundaries.

Next, Defendants disagree with the United States' argument that roughly 6,000 acres of land taken into trust under the 1934 Act are "Indian country" under 18 U.S.C. § 1151(a). Defendants contend the text of the 1934 Act, the legislative history, early treatment of the lands, case authority, and an admission by the United States in another case all defeat the notion that the trust lands are "reservation" under § 1151(a). The textual argument is that the structure of the 1934 Act precludes a finding that Section 5, 25 U.S.C. § 465, "trust" lands are automatically Section 7, 25 U.S.C. § 467, "reservation" lands. Specifically, Defendants interpret Section 7 to require a "proclamation" by the Secretary of the Interior that the lands taken into trust under Section 5 are "reservation" lands. In support of this argument, Defendants cite *United States v. Stands*, 105 F.3d 1565 (8th Cir. 1997). Defendants contend *Stands* is directly on point and holds that placement of land into trust for an Indian tribe does not make such land "reservation" or "Indian country."

An additional argument raised by the Defendants is that certain lands claimed as trust land have never been formally accepted into trust status, and, therefore, such lands are neither trust land nor reservation. Specifically, the Defendants argued in their pre-trial brief that 3,201 acres of land, constituting thirty parcels, are not trust land because the United States cannot produce any written acceptance of these lands into trust status. At trial, however, the Court ruled the Defendants are barred from challenging the trust status of these lands because the United States has not waived its sovereign immunity under the Quiet Title Act, 28 U.S.C. § 2409a(a), as to lands held in trust for Indians, and therefore, the Court lacks jurisdiction to even consider the merits of Defendants' challenge to the United States title to the lands at issue. *See Governor of Kansas v. Kempthorne*, 505

6

F.3d 1089 (10th Cir. 2007) (the courts lack jurisdiction to address the merits of a quiet title action against the United States involving trust lands because the United States has not waived its sovereign immunity under the Quiet Title Act as to land held in trust for Indian tribes).

As to the allotted lands, the Defendants argue the remaining allotted lands within the 1858 boundaries are not "reservation" or "Indian country" under 18 U.S.C. § 1151(a). Rather, Defendants argue the allotted lands are "Indian country" under 18 U.S.C. § 1151(c), to the extent that such allotted lands have not left Indian hands. In support of this argument, Defendants point to the Eighth Circuit's holding that the Yankton Sioux Reservation "has been further diminished by the loss of those lands originally allotted to tribal members which have passed out of Indian hands. These lands are not part of the Yankton Sioux Reservation and are no longer Indian country within the meaning of 18 U.S.C. § 1151." *Gaffey II*, 188 F.3d at 1030. Defendants conclude the allotted lands cannot be "reservation" under § 1151(a), because the Supreme Court ruled in *Seymour v. Superintendent of Wash. State Penitentiary*, 368 U.S. 351 (1962), that allotted land leaving allotted status remains "Indian country" *only* if it is on a "reservation." The short answer is that such lands are on a reservation because those lands form a part of the boundaries of this checkerboard reservation.

The Yankton Sioux Tribe's position is that the Court should draw a boundary in the northern part of Charles Mix County that excludes the ceded lands referred to by the Supreme Court and leave untouched the east, west and south boundaries of the 1858 Yankton Sioux Reservation. Exhibit 9, received as an illustrative exhibit at the trial, depicts the Tribe's "suggested boundary" of the Yankton Sioux Reservation. This Exhibit shows a reservation with one continuous boundary. A checkerboard reservation should be avoided, argues the Tribe, because drawing a boundary around each parcel of trust land, or each Indian owned parcel, would result in a less desirable checkerboard reservation. The Tribe also points out that the Defendants' position, that the Yankton Sioux Reservation was disestablished, has been consistently rejected by the Supreme Court, the Eighth Circuit and this Court.

The United States likewise argues the Defendants' arguments regarding disestablishment are foreclosed by the Eighth Circuit's holding that the Yankton Sioux Reservation has not been disestablished. *See Gaffey*, 188 F.3d at 1030 ("[W]e hold that the Yankton Sioux Reservation has not been disestablished ...."). In addition, the United States contends the Defendants' challenge to certain deeds placing land in trust for the Yankton Sioux Tribe thirty to seventy years ago, is precluded because the United States has not waived its sovereign immunity under the Quiet Title Act, 28 U.S.C. § 2409a, and by the six-year statute of limitations for actions brought under the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.* As set forth above, the Court agreed with the United States' argument and held during the trial that the Defendants are barred from challenging the United States' title to the lands it holds in trust for the Yankton Sioux Tribe and its members. *See Governor of Kansas*, 505 F.3d at 1089.

The United States' position on what remains of the diminished Yankton Sioux Reservation is: the land originally set aside for the Yankton Sioux by treaty in 1858 that are Indian trust allotments that remain in Indian ownership; those lands returned to the Tribe by Act of February 13, 1929, 45 Stat. 1167; and, those lands taken into trust for the Tribe under the Indian Reorganization Act, 25 U.S.C. §§ 461 *et seq.* These lands, according to the United States, are Indian country under 18 U.S.C. § 1151(a), as they are "within the limits of any Indian reservation under the jurisdiction of the United States Government ...." As to the Indian owned fee land, the United States does not take a position on whether such land is included in the Yankton Sioux Reservation, leaving that issue for the Tribe to pursue. The United States also does not take a position on the 1927 Act and 1934 Act claims advanced by the Tribe.

As to the lands taken into trust for the Tribe under the 1934 Act, the United States argues that although the 1858 original exterior boundaries no longer serve to separate Indian country from areas under State jurisdiction, when the property is reacquired in trust within those boundaries, it becomes reservation and Indian country pursuant to 18 U.S.C. § 1151(a).

8

Addressing one of the Defendants' arguments, the United States contends its conclusion that tribal trust land is reservation is not inconsistent with the Secretary of the Interior's separate authority under 25 U.S.C. § 467 to add lands to existing reservations. Contrary to the Defendants' claim, the United States contends the plain reading of § 467 is that there is no requirement for proclamation in order to add lands to an existing Indian reservation. The United States correctly distinguishes the case cited by the Defendants, *Citizens Exposing Truth About Casinos v. Kempthorne*, 492 F.3d 460 (D.C. Cir. 2007) ("*Citizens*"), from the present case because *Citizens* involved the creation of a new reservation that would require a proclamation under 25 U.S.C. § 467. Further, *Citizens* involved the creation of a new reservation that would qualify for gaming as an "initial reservation" under the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.*, which is not involved in the present case.

A second case the United States distinguishes is *South Dakota v. United States Dept. of Interior*, 487 F.3d 548 (8th Cir. 2007). In *South Dakota*, the Flandreau Santee Sioux Tribe sought to place land in trust that was never within its reservation boundaries and the Eighth Circuit left unanswered the question of whether "all land taken into trust *off reservation* ... constitutes Indian country." *Id.* at 553 (emphasis added). Accordingly, the *South Dakota* case did not involve the present question of whether land taken into trust within the original exterior boundaries of an Indian reservation that has not been disestablished is Indian country under 18 U.S.C. § 1151(a).

In addition to the above positions, the United States contends the lands acquired in trust under the 1934 Act can constitute an informal or de facto reservation under 18 U.S.C. § 1151(a).

Another category of lands at issue is the reserve lands, which were lands reserved for the Tribe for agency, schools, and other purposes and reserved from sale to settlers. The United States' position regarding the reserve lands is that the *Gaffey* court found that these lands "were expected to remain outside of primary state jurisdiction," which, conversely, means they were intended to remain within federal jurisdiction. *Gaffey*, 188 F.3d at 1027. The 1929 Act, 45 Stat. 1167, resolved any doubt about the reserve lands, urges the United States, wherein Congress unambiguously

demonstrated its intent that the reserve lands be transferred to the Tribe when they are no longer needed for the original purposes for which they were reserved.

The Court allowed the filing of an amici curiae brief by Charles Mix County landowners, Doc. 335, wherein the landowners urge the Court to reject the Tribe's arguments regarding the 1927 and 1934 Acts and to conclude the only lands to be reservation or Indian Country are those lands which are currently held in trust by the United States for the benefit of an Indian person.

## II. DISCUSSION

The Supreme Court has made clear that "only Congress can divest a reservation of its land and diminish its boundaries. Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise." *Solem v. Bartlett*, 465 U.S. 463, 470 (1984).

The inescapable result of the prior court decisions interpreting Congressional acts affecting the Yankton Sioux Reservation is that it is a checkerboard reservation. The Eighth Circuit clearly envisioned a checkerboard reservation pursuant to its dual holdings that the 1858 reservation boundaries are no longer in effect and that, "the land reserved to the federal government in the 1894 Act and then returned to the Tribe continues to be a reservation under § 1151(a) ...." *Gaffey II*, 188 F.3d at 1030. The land reserved to the federal government and returned to the Tribe was identified as one category of trust land on the Yankton Sioux Reservation and it consists of scattered lands throughout the original 1858 reservation. The Eighth Circuit made clear that these scattered lands continue to be Indian country under 18 U.S.C. § 1151(a). As with the reserve lands, the two additional categories of trust lands identified by the Eighth Circuit consist of scattered lands within the original 1858 boundaries. *See id.* Although the Eighth Circuit was able to identify the categories of trust land existing on the Yankton Sioux Reservation, the record had not been developed as to which tracts of land fall within those categories. Accordingly, on remand the parties were directed to develop the record as to which tracts of land on the Yankton Sioux Reservation are in the three

categories of trust land identified by the Eighth Circuit. The trial record does now contain that information.

The Court will first address the Tribe's claims that the 1927 and 1934 Acts froze the boundaries of the Yankton Sioux Reservation. Next, the Court will discuss whether trust lands are reservation land and whether the land qualifies as Indian country under 18 U.S.C. § 1151(a) or (c). United States' claim that the Yankton Sioux Reservation is a de facto or informal reservation will then be discussed. The final categories of land that will be addressed is Indian-owned fee land continuously held in Indian hands. Finally, the Court will discuss dependent Indian communities.

**A.      1927 Act Claim**

The Tribe contends Congress froze the reservation boundaries when it enacted 25 U.S.C. § 398d, referred to above as "the 1927 Act", such that all lands sold to non-Indians after 1927 and before the Supervised Sales Act of 1948, 62 Stat. 236, codified at 25 U.S.C. § 483, are within the reservation boundaries. The 1927 Act provides as follows: "**§ 398d. Changes in boundaries of Executive order reservations**. Changes in the boundaries of reservations created by Executive order, proclamation, or otherwise for the use and occupation of Indians shall not be made except by Act of Congress." 25 U.S.C. § 398d.

Defendants' first argument is that the Tribe waived this claim by failing to raise it earlier in the litigation. In a Memorandum Opinion and Order, Doc. 223, the Court held the issue of the 1927 Act would be decided in these remand proceedings. The specific reasons for rejecting Defendants' waiver arguments as to both the 1927 Act claim and the 1934 Act claim were explained by the Court in its Response to Defendants' Petitions for Writ of Mandamus, filed with the Eighth Circuit in April 2007:

> Regarding the 1934 Act argument advanced by the Tribe on remand and referred to in the Court's Memorandum Opinion and Order dated December 13, 2006, the Eighth Circuit clearly contemplated argument and development of the record on remand of "land taken into trust under the Indian Reorganization Act of 1934." *Gaffey II*, 188 F.3d at 1030. Thus, the Eighth Circuit clearly contemplated the Court would consider arguments concerning the 1934 Act on remand. The Eighth Circuit

recognized there will be additional issues on remand that were not decided in prior proceedings due to the limited development of the record on issues other than disestablishment or maintenance of the 1858 boundaries. *Id.* at 1030-31. The Court finds the Tribe's arguments regarding the 1927 Act, at least at this point in the proceedings, are similar in nature to the arguments regarding the 1934 Act. If the Eighth Circuit believed that all arguments not previously raised by the Tribe were waived, there would have been no reason to remand this case to this Court for development of the record and further proceedings consistent with its opinion. The Eighth Circuit recognized the parties "followed an all or nothing strategy (the State arguing disestablishment and the Tribe claiming maintenance of the 1858 boundaries)," *Gaffey II*, 188 F.3d at 1030, which resulted in an incomplete record. Moreover, it would have been a waste of judicial resources for the parties and the Court to make the necessary findings and conclusions regarding the 1927 Act and the 1934 Act without a final ruling regarding disestablishment or maintenance of the 1858 boundaries.

*Petition for Writ of Mandamus,* Nos. 07-1723, 07-1779, *In re: Michael Rounds, et al.,* (8th Cir. Mar. 22, 2007) (District Court's Response to Defendants' Petitions for Writ of Mandamus). Defendants' waiver, law of the case and mandate rule arguments are rejected for the reasons quoted above.

Citing *Sioux Tribe of Indians v. United States,* 316 U.S. 317, 325 (1942) and the 1927 Act's legislative history[4], the Defendants contend the 1927 Act applies only to reservations created by Executive order or proclamation and not to reservations created by treaty. There is no dispute that the Yankton Sioux Reservation was created by treaty, rather than by Executive order or

---

[4]The Defendants argue if the 1927 Act were to apply to *all* reservations, including treaty reservations, the language in the statute specifying its application to executive order reservations would have been unnecessary. In support of this argument, the Defendants quote comments from a House debate distinguishing between treaty and executive order reservations:

> Now let us go just a little into the history of the difference between a treaty reservation and an Executive-order reservation. A treaty reservation is one by which the Indians are placed on certain areas of land under an agreement with the Indians – land usually formerly occupied and owned by these same Indians under right of occupancy. An Executive-order reservation is that which is set aside for the tribe by Executive proclamation and this character of reservation is also usually composed of a portion of lands formerly occupied by such Indians.

68 Cong. Rec. 4571 (1927).

12

proclamation. The Tribe cites no case law or legislative history in support of its claim that the reservation boundaries were frozen as of 1927. Rather, the Tribe argues the "language of that statute is eminently clear." (Plaintiff's Supplemental Brief, Doc. 367 at p. 2.).

The Court finds the language of 25 U.S.C. § 398d unambiguously applies to reservations created by action of the Executive, whether it be by order, proclamation or otherwise, and does not apply to reservations created by treaty, such as the Yankton Sioux Reservation. *See Sioux Tribe*, 316 U.S. at 325 n.6 (distinguishing between executive order reservations and treaty reservations and noting that with the 1927 Act, Congress provided that, "any future changes in the boundaries of executive order reservations should be made by Congress alone."). Accordingly, the boundaries of the Yankton Sioux Reservation were not frozen by the 1927 enactment of 25 U.S.C. § 398d.

**B.     1934 Act Claim**

The second frozen boundaries claim advanced by the Tribe is that the Indian Reorganization Act, referred to above as "the 1934 Act", froze the boundaries of the Yankton Sioux Reservation upon its enactment. Section 2 of the 1934 Act provides that, "[t]he existing periods of trust placed upon any Indian lands and any restriction on alienation thereof are extended and continued until otherwise directed by Congress." 25 U.S.C. § 462. In addition, the sale of allotments was restricted in 1934 under 25 U.S.C. § 464, which stated that, "[e]xcept as provided in this Act, no sale, devise, gift, exchange, or other transfer of restricted Indian lands ... shall be made or approved ...."

Defendants' arguments of waiver, law of the case and violation of the mandate as to the 1934 Act claim are rejected for the same reasons explained above for rejecting these arguments as to the 1927 Act claim.

It was clearly Congress' intent in enacting the 1934 Act to halt the loss of land on the nation's Indian reservations as a result of the allotment policy. *See Chase v. McMasters*, 573 F.2d 1011, 1016 (8th Cir. 1978) (explaining that the Indian Reorganization Act of 1934 "reflected a new federal policy of halting the loss of Indian lands which had occurred under statutes that allotted tribal lands

13

to individual Indians and disposed of 'surplus' land under settlement laws."). It naturally follows that one result of the 1934 Act was to "freeze" the boundaries of the Yankton Sioux Reservation.

Legislative history is quoted by the Defendants, but legislative history is not persuasive if the statute itself is clear on its face. *See United States v. Maswai*, 419 F.3d 822, 824 (8th Cir. 2005) (explaining that a court's "task in interpreting legislation is to start with the plain meaning of its words, and 'only if the statute is ambiguous do we look to the legislative history to determine Congress's intent.'"). Sections 462 and 464 are clear. There was to be "no sale, devise, gift, exchange, or other transfer of restricted Indian lands ...." 25 U.S.C. § 464. Self-serving opinions by various government officials that they could still transfer Indian lands, despite the 1934 Act, are contrary to law and provide no authority for such transfers.

The "freezing" of the boundaries of the Yankton Sioux Reservation ended in 1948 when Congress enacted the Supervised Sales Act, 25 U.S.C. § 483[5], which lifted restrictions of the 1934 Act and allowed the Secretary of the Interior to grant patents in fee to Indian owners upon application. As explained below in the discussion of the Indian country status of trust lands, the Court finds that land placed into trust for the Yankton Sioux Tribe and its members under the 1934 Act is Indian country under § 1151(a). Rather than continuing to freeze the boundaries, the Court finds the boundaries of the Yankton Sioux Reservation change when land is taken into trust under the 1934 Act. Accordingly, the Court accepts that portion of the Tribe's claim that the 1934 Act froze the boundaries of the Yankton Sioux Reservation at the time of its enactment, but rejects the

---

[5]Section 483 provides as follows:

The Secretary of the Interior, or his duly authorized representative, is authorized in his discretion and upon application of the Indian owners, to issue patents in fee, to remove restrictions against alienation, and to approve conveyances, with respect to lands or interests in lands held by individual Indians under the provision of the Act of June 18, 1934 (48 Stat. 984) [25 U.S.C. § 461 et seq.], or the Act of June 26, 1936 (49 Stat. 1967) [25 U.S.C. § 501 et seq.].

25 U.S.C. § 483.

Tribe's claim that the freeze continued through the present time. The "freeze" ended in 1948, thereby nullifying the present and ultimate effect of a "freeze" from 1934 to 1948. *See Oglala Sioux Tribe of the Pine Ridge Indian Reservation v. Hallett*, 708 F.2d 326, 330-31 (8th Cir. 1983) ("Assuming that Section 4 of the Indian Reorganization Act did limit the Secretary's authority to issue fee patents to individual allottees, Congress lifted that limitation in 1948, as to trust lands 'held ... under' the Indian Reorganization Act of 1934, by passing 25 U.S.C. § 483 (1976).") (footnote omitted).

Likewise, the Supervised Sales Act of 1948 cured those real estate transfers. The "freeze" was as to land transfers and not as to any one boundary, because even in 1934 to 1948 there was no one, single reservation boundary. The various boundaries that were frozen during that time period were various tracts of Indian land held by the United States. At trial, the Tribe claimed there were tracts of land affected by this 1934 freezing claim, but no proper foundation was established for the admission of such evidence so this 1934 freezing analysis might be a moot issue. In addition, there is nothing in the record to indicate that any land was subject to the Sioux exception as stated in 25 U.S.C. § 474 (Section 14 of the 1934 Act). Even if it is not a moot issue, any resulting title defects were cured by the Supervised Sales Act of 1948.

Finally, it is not clear whether or not the Tribe properly excluded itself from the operation of the 1934 Act. It takes affirmative steps for such exclusion and the record does not show full compliance with the requirements for exclusion from the 1934 Act, so no exclusion is found even though it was apparently attempted. *See* 25 U.S.C. § 478.

## C.    Status of Trust Lands on Yankton Sioux Reservation

The Eighth Circuit remanded this case for the Court to make "any necessary findings relative to the status of Indian lands which are held in trust," because "[t]he current amount of Indian trust land on the Yankton Sioux Reservation [was] unclear from the record [before the Eighth Circuit]." *Gaffey II*, 188 F.3d at 1030. During the Court trial in this action, the parties identified the tracts of land on the Yankton Sioux Reservation that are within the three categories of trust land identified

15

by the Eighth Circuit: "1) the land reserved to the federal government in the 1894 Act and later returned to the Yankton Tribe, 2) land allotted to individual Indians that remains held in trust, and 3) land taken into trust under the Indian Reorganization Act of 1934." *Id.*

Four spreadsheets, admitted at trial as Exhibits 202, 203, 204 and 211, list the current tracts of trust land on the Yankton Sioux Reservation. In addition to the spreadsheets, there are sub-exhibits, which provide documentation relating to each of the tracts of land listed on the spreadsheets. During the trial, the parties agreed that some of the tracts were listed in the wrong category on the spreadsheets. Accordingly, after the trial the United States submitted a Motion clarifying the stipulations entered into at trial by the parties regarding certain tracts of land and attached revised spreadsheet Exhibits and explaining which tracts were to be moved to different categories. The Court entered an Order granting this unopposed motion. (Doc. 423.) In the revised spreadsheet exhibits submitted after the Court trial, Exhibit 202 lists the tracts of trust land on the Yankton Sioux Reservation that were taken into trust by the United States after the 1934 Act, totaling 6,444.47 acres. Revised Exhibit 203 lists the tracts of trust land on the Yankton Sioux Reservation that were pre-1934 fee to trust or non-reserve Secretarial order trust lands, totaling 174.57 acres. Exhibit 204 lists the tracts of land on the Yankton Sioux Reservation that were allotted trust lands and are now tribal trust lands, totaling 4,496.58 acres. Exhibit 211 lists the tracts of land on the Yankton Sioux Reservation that are allotted trust lands, totaling 25,555.08 acres.

The Eighth Circuit recognized in *Gaffey II* that before the modern definition of Indian country, set forth in 18 U.S.C. § 1151, was established in 1948, "Indian lands were defined to include 'only those lands in which the Indians held some form of property interest: trust lands; individual allotments, and, to a more limited degree, opened lands that had not yet been claimed by non-Indians.'" *Gaffey II*, 188 F.3d at 1022. Thus, determining Congressional intent before 1948 as to "reservation" status under § 1151(a) "is complicated by the fact that modern distinctions between different categories of Indian country were not recognized by ... legislators who had a different understanding of the requirements for land to be classified as reservation land and/or Indian

16

country." *Id.* at 1021. "The notion of a reservation as a piece of land, all of which is Indian country regardless of who owns it, would have thus been quite foreign." *Id.* at 1022.

### 1. Reserve lands

Defendants' argument that none of the categories of land defined by the Courts or the parties constitute "reservation" under 18 U.S.C. § 1151(a), is a veiled attempt to discredit the result of the Eighth Circuit's decision in *Gaffey II*, which is that the Yankton Sioux Reservation is now a checkerboard reservation. The Eighth Circuit clearly envisioned the Yankton Sioux Reservation is a checkerboard reservation pursuant to its dual holdings that the 1858 reservation boundaries are no longer in effect and that, "the land reserved to the federal government in the 1894 Act and then returned to the Tribe continues to be a reservation under § 1151(a) ...." *Gaffey II*, 188 F.3d at 1030. The first category of trust land, i.e., land reserved to the federal government in the 1894 Act and later returned to the Tribe, consists of scattered lands throughout the original 1858 reservation. The Eighth Circuit made clear that these scattered reserve lands continue to be Indian country under § 1151(a), which can only mean that there is a checkerboard reservation. The other two categories of trust land described by the Eighth Circuit likewise consist of scattered land within the 1858 boundaries of the Yankton Sioux Reservation.

### 2. Land allotted to individual Indians that remains held in trust

The Eighth Circuit declared that although the Yankton Sioux Reservation has not been disestablished, "it has been further diminished by the loss of those lands originally allotted to tribal members which have passed out of Indian hands." *Gaffey II*, 188 F.3d at 1030. Accordingly, if originally allotted land passed out of Indian hands at any time after it was allotted, it is not part of the Yankton Sioux Reservation. Trial Exhibit 211 identifies the tracts of land on the Yankton Sioux Reservation that are allotted trust lands. As to this category of lands, the Defendants contend the law of the case pursuant to *Gaffey II*, is that allotted land can only be Indian country under 18 U.S.C. § 1151(c) and cannot be Indian country under § 1151(a).

Contrary to the Defendants' arguments, the United States contends allotted land that remains held in trust is reservation, and thus Indian country under § 1151(a), as a result of the Eighth Circuit's findings that the Yankton Sioux Reservation was not disestablished and that the text of the 1894 Act establishes the Congressional intent to "reserve land to be used to care for continued tribal interests," *Gaffey II*, 188 F.3d at 1028, in combination with the overarching principle that "[a]fter land is set aside for an Indian reservation, it retains that status until Congress explicitly indicates otherwise," *Solem*, 465 U.S. at 469. Due to the sparsity of the factual record, the Eighth Circuit was unable to identify on the record before it which allotted land remained held in trust by the United States. *See Gaffey II*, 188 F.3d at 1028, 1030. That information was presented to the Court on remand in Trial Exhibit 211.

The Court agrees with the United States' position and further notes that there has been no finding by the appellate courts that the Yankton Sioux Reservation has been diminished by allotted land that remains held in trust. The Court finds no evidence of Congressional intent to so diminish the Yankton Sioux Reservation. Accordingly, the land allotted to individual Indians that remains held in trust is reservation and is Indian country under 18 U.S.C. § 1151(a).

### 3. Lands taken into trust under the 1934 Act

As to the lands taken into trust under the 1934 Act, the United States claims that although the 1858 original exterior boundaries no longer serve to separate Indian country from areas under State jurisdiction, when the property is reacquired in trust within those boundaries, it becomes reservation and Indian country pursuant to 18 U.S.C. § 1151(a). Defendants, however, contend a parcel of land taken into trust under 25 U.S.C. § 465, part of the 1934 Act, cannot be reservation land unless there is a proclamation under 25 U.S.C. § 467 that it is a new reservation or is added to an existing reservation. Section 467 provides that:

> The Secretary of the Interior is hereby authorized to proclaim new Indian reservations on lands acquired pursuant to any authority conferred by this Act, or to add such lands to existing reservations: *Provided*, That lands added to existing reservations

18

shall be designated for the exclusive use of Indians entitled by enrollment or by tribal membership to residence at such reservations.

25 U.S.C. § 467.

Defendants' interpretation of 25 U.S.C. § 467 is strained. Contrary to Defendants' argument, the United States contends its conclusion that tribal trust land is reservation is not inconsistent with the Secretary of the Interior's separate authority under 25 U.S.C. § 467 to add lands to existing reservations. The United States argues the plain reading of § 467 is that there is no requirement for proclamation in order to add lands to an existing Indian reservation. The United States argues the case cited by the Defendants, *Citizens*, 492 F.3d at 460, is distinguishable from the present case because *Citizens* involved the creation of a *new* reservation that would require a proclamation under 25 U.S.C. § 467. Further, *Citizens* involved the creation of a new reservation that would qualify for gaming as an "initial reservation" under the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.*, which is not involved in the present case. The Court agrees that *Citizens* is inapplicable to the case before the Court for the reasons advanced by the United States.

A second case the United States seeks to distinguish is *South Dakota*, 487 F.3d at 548, which was cited by the Defendants. In *South Dakota*, the Flandreau Santee Sioux Tribe sought to place land in trust that was never within its reservation boundaries and the Eighth Circuit left unanswered the question of whether "all land taken into trust *off reservation* ... constitutes Indian country." *Id.* at 553 (emphasis added). Accordingly, the Court agrees with the United States that the *South Dakota* case did not involve the question of whether land taken into trust within the original exterior boundaries of an Indian reservation that has not been disestablished is Indian country under 18 U.S.C. § 1151(a).

The Court interprets 25 U.S.C. § 467 to require a proclamation by the Secretary only in situations where new Indian reservations are being created. As observed by the United States, "[i]t is redundant to proclaim the land a reservation when it is acquired in trust for the Tribe within a reservation that is not disestablished." (Doc. 346 at p. 8.) The acquisition of land not previously

within the boundaries of an Indian reservation presents a different situation than acquiring land in trust within the original boundaries of a diminished reservation. The land acquisition regulations under the 1934 Act treat acquisitions on a diminished reservation as an on-reservation acquisition. *See* 25 C.F.R. § 151(f). The Court rejects Defendants' argument and holds that the absence of a proclamation under 25 U.S.C. § 467 for land taken into trust under the 1934 Act, 25 U.S.C. § 465, which is within the original boundaries of a diminished reservation, does not prevent the land from being reservation land. Given the Eighth Circuit's holding that the Yankton Sioux Reservation was not disestablished, in combination with its holding that the reserve lands continue to be reservation under § 1151(a), and the Court's finding that a proclamation under 25 U.S.C. § 467 was not required in this case, the Court concludes all land within the original 1858 treaty boundaries of the Yankton Sioux Reservation held by the United States in trust pursuant to the 1934 Act constitutes reservation and Indian country under 18 U.S.C. § 1151(a).

## D.   Informal or De facto Reservation

An alternate position advanced by the United States is that all of the land held by the United States in trust for the Tribe and its individual members is a "reservation" for purposes of federal criminal jurisdiction under 18 U.S.C. § 1151(a), even if it is found to not be a formally designated reservation. *See Oklahoma Tax Comm'n v. Citizen Band of Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 511 (1991). In *Oklahoma Tax Comm'n*, the Supreme Court explained it has "stated that the test for determining whether land is Indian country does not turn upon whether that land is denominated 'trust land' or 'reservation.' Rather, we ask whether the area has been 'validly set apart for the use of the Indians as such, under the superintendence of the Government.'" 498 U.S. at 511 (quoting *United States v. John*, 437 U.S. 634, 648-49 (1978)). In *United States v. John*, 437 U.S. 634, 648-49 (1978), the Supreme Court held the federal government had authority to prosecute an Indian, under 18 U.S.C. §§ 1153 and 1151(a), for a crime committed on land held in trust by the United States for the benefit of the Mississippi Choctaw Indians, who were under federal supervision. In that case, the land at issue was later proclaimed to be a reservation, but the Supreme Court held that prior to the proclamation there was "no apparent reason why these lands, which had been purchased in previous years for the aid of [the Mississippi Choctaw] Indians [and held in trust

20

by the Federal Government for their benefit], did not become a 'reservation,' at least for the purposes of federal criminal jurisdiction at that particular time." *Id.* (citing *United States v. Celestine*, 215 U.S. 278, 285 (1909)).

In a case considering whether certain land was "Indian country" under 18 U.S.C. § 1151(a), the Eighth Circuit explained, "[i]t is well established that the actions of the federal government in its treatment of Indian land can create a *de facto* reservation, even though the reservation was not created by a specific treaty, statute or executive order." *United States v. Azure*, 801 F.2d 336, 338 (8th Cir. 1986). In an effort to avoid this holding in *Azure*, Defendants cite *Stands*, 105 F.3d at 1572, for the proposition that placing land into trust for an Indian tribe does not make it Indian country under 18 U.S.C. § 1151. In *Stands*, the Eighth Circuit stated, "[f]or jurisdictional purposes, tribal trust land beyond the boundaries of a reservation is ordinarily not Indian country." *Id.* at 1572. But *Stands* does not control the result in this case. *Stands* considered federal jurisdiction, under 18 U.S.C. § 1151(c), on land that was outside the clearly defined boundaries of a reservation. *See id.* Rather than considering jurisdiction under § 1151(c) over allotted land that is outside the clear boundaries of a diminished reservation, as in *Stands*, the Court is faced in this case with determining what the boundaries are of a diminished reservation. Moreover, as recognized by Chief Judge Karen E. Schreier, the above quoted language in *Stands*, "is dicta which does not overcome the wealth of legal authority establishing that trust land qualifies as 'Indian country.'" *South Dakota v. United States Dep't of Interior*, 401 F.Supp.2d 1000, 1010 (D.S.D. 2005) (citing *Oklahoma Tax Comm'n*, 498 U.S. at 511; *United States v. Roberts*, 185 F.3d 1125, 1131 (8th Cir. 1999); *Buzzard v. Okla. Tax Comm'n*, 992 F.2d 1073, 1076 (10th Cir. 1993), *cert. denied sub. nom. United Keetoowah Band of Cherokee Indians v. Okla. Tax Comm'n*, 510 U.S. 994 (1993); *Azure*, 801 F.2d at 338)).

Citing *Azure*, 801 F.2d at 338-39, the *Stands* court recognized federal jurisdiction under § 1151(a) may be established if the land at issue is found to be a de facto reservation or dependent Indian community. 105 F.3d at 1572 n.3. That situation was not addressed in *Stands*, however, because the government had not argued that *Azure* or similar cases applied to the land at issue in *Stands*. Interestingly, the holding in *Stands* was that an individual allotment off the reservation was

21

"Indian country" for purposes of federal criminal jurisdiction. The Court finds the above-quoted language from *Stands* is dicta and is not controlling in the present case, and in any event, for the reasons set forth above, the present case is distinguishable from *Stands*. The Court further finds the Eighth Circuit's earlier holding in *Azure*, 801 F.3d at 338, applies to the land at issue in the present case.

As to all of the trust land identified in Revised Exhibits 202, 203, 204 and 211, the federal government has validly set apart that land for use of the Yankton Sioux Indians. Donalene Orozo, the Realty Officer in the Bureau of Indian Affair's ("BIA") Yankton Agency in Wagner, testified that her office maintains all leases on trust lands on the Yankton Sioux Reservation. The BIA negotiates the leases, collects the rents and distributes the rents according to tribal status reports. Federal Bureau of Investigation Agent Matthew Miller testified that the FBI exercise criminal jurisdiction over all trust land on the Yankton Sioux Reservation, and does not distinguish between land taken into trust under the 1934 Act, reserve land, or allotted land held in trust. Agent Miller relies upon the BIA Realty Office to advise him whether any particular tract of land is held in trust by the United States. The above-referenced testimony establishes that the federal government provides supervision over all trust lands on the Yankton Sioux Reservation. Based upon the exhibits received during the trial and the testimony of Ms. Orozo and FBI Agent Matthew Miller, the Court concludes the federal government has validly set apart the tracts of land identified in Revised Exhibits 202, 203, 204 and 211 for use of the Yankton Sioux Indians. Accordingly, the trust lands identified in Revised Exhibits 202, 203, 204 and 211 constitute a reservation, at least for purposes of jurisdiction under 18 U.S.C. § 1151(a).

**E.    Indian-owned fee land continuously held in Indian hands**

The Eighth Circuit held that the Yankton Sioux Reservation "has been further diminished by the loss of those lands originally allotted tribal members which have passed out of Indian hands." *Gaffey II*, 188 F.3d at 1030. As to Indian-owned fee lands, the Eighth Circuit assumed "that land now owned in fee by individual Indians is not under tribal jurisdiction unless it is found to be 'within the limits of [the] Indian reservation.' 18 U.S.C. § 1151(a)." *Id.* The Eighth Circuit's diminishment

finding is limited to previously allotted lands *which have passed out of Indian hands. Id.* (emphasis added). There has been no finding by an appellate court and this Court finds no evidence on this record that Congress intended to diminish the Yankton Sioux Reservation by previously allotted land now owned in fee which has never passed out of Indian hands. The principle that "[a]fter land is set aside for an Indian reservation, it retains that status until Congress explicitly indicates otherwise," *Gaffey II*, 188 F.3d at 1021 (citing *Solem*, 465 U.S. at 470), applies to these lands. Above, the Court found that trust lands are reservation under 18 U.S.C. § 1151(a), and the Court finds no reason to treat any differently Indian-owned fee land on the Yankton Sioux Reservation, which has been continuously held in Indian hands. Accordingly, the Court finds that previously allotted land, which is now owned in fee and has been continuously owned by an Indian, retains its reservation status and it is Indian country under 18 U.S.C. § 1151(a).[6]

The Tribe introduced exhibits depicting Indian-owned fee land, but there was no evidence to show whether such land has continuously been held in Indian hands. Unless previously allotted land, which became fee land and passed out of Indian hands, was taken back into trust by the United States, it is no longer part of the Yankton Sioux Reservation under the previous decision of the Eighth Circuit. *See Gaffey II*, 188 F.3d at 1030 (holding that the Yankton Sioux Reservation "has been further diminished by the loss of those land originally allotted to tribal members which have passed out of Indian hands."). Although the record was not fully developed regarding Indian-owned fee land, the Court finds it sufficient for purposes of this remand proceeding to define that category of land as reservation, which is subject to federal criminal jurisdiction under 18 U.S.C. § 1151(a). Whether a particular tract of previously allotted land is Indian-owned fee land that has continuously been held in Indian hands can be verified at any given time by the land title records maintained by the BIA's Realty Office.

---

[6]If and when any of that land is sold to a non-Indian, then that land will no longer be a part of the Yankton Sioux Reservation. Who is and who is not an Indian is already well defined in the law.

**F.      Dependent Indian Community**

The Court has considered whether any of the trust lands at issue in this case qualify as Indian country under 18 U.S.C. § 1151(b)[7] as a dependent Indian community. During the trial, the Court questioned the Charles Mix County State's Attorney, Scott Podhradsky, about this possibility. He testified that based upon his predecessor's beliefs, there are three dependent Indian communities in Charles Mix County, which he identified as South Housing in Wagner, North Housing in Wagner and South Housing, just south of Lake Andes.

Other than the above, the record does not contain evidence as to what, if any, other areas might be dependent Indian communities. The Court recognizes that if the Indian population grows in some of the areas in question, other dependent Indian communities might develop.

To the extent any of the trust land discussed in this opinion would be found by an appellate court to not be "reservation" land, and thus not Indian country under § 1151(a), the Court finds such trust land would nevertheless qualify as Indian country under § 1151(b), as a dependent Indian community. The Supreme Court established two requirements for off-reservation land to qualify as a dependent Indian community under § 1151(b): "a federal set-aside *and* a federal superintendence requirement." *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520, 530 (1998). It was established at trial that all of the trust land identified in Revised Exhibits 202, 203, 204 and 211 (revised post-trial) has been set aside by the federal government in trust for the Indians residing within the original 1858 boundaries of the Yankton Sioux Reservation. The federal government exercises superintendence over these trust lands, as testified to by Ms. Orozo and FBI Agent Miller. Accordingly, these trust lands meet the two requirements for a dependent Indian community. Similar

---

[7]Section 1151(b) provides:
Except as otherwise provided in section 1154 and 1156 of [Title 18], the term "Indian country", as used in this chapter, means ... (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state ....

18 U.S.C. § 1151(b).

to the result of finding the trust lands are "reservation" under § 1151(a), as described in this opinion, a finding that the trust lands qualify as Indian country under § 1151(b) results in the Yankton Sioux Reservation being a checkerboard reservation.

## III. CONCLUSION

Based upon the discussion above, the Court finds all the trust land and Indian-owned fee land that has continuously been held in Indian hands, which is within the original 1858 treaty boundaries of the Yankton Sioux Reservation, is Indian country under 18 U.S.C. § 1151(a). If any of the trust land is found by a superior court to not be "reservation" land, and thus not Indian country under 18 U.S.C. § 1151(a), such trust land qualifies as Indian country under 18 U.S.C. § 1151(b), as a dependent Indian community. Although it would be preferable for law enforcement and administrative purposes to have one line surrounding a wholly contiguous reservation, it appears from Charles Mix County State's Attorney Scott Podhradsky's testimony at trial that the federal, state, county and city law enforcement officers working on the Yankton Sioux Reservation have established a workable system regarding the exercise of criminal jurisdiction. Even if the Yankton Sioux Reservation as now diminished presented law enforcement problems, those problems would have to be countenanced for the Reservation as diminished is what varying federal Indian policies have created. Thus, while the checkerboard reservation is not the ideal result from the various points of view of any of the parties, the exercise of checkerboard federal criminal jurisdiction on the Yankton Sioux Reservation is a workable law enforcement environment. The busy criminal docket before this Court from the Yankton Sioux Reservation confirms that observation. Aside from those observations, the Indians are entitled by law to their reservation, diminished as it is. Accordingly,

IT IS ORDERED:

1.    That a Declaratory Judgment will be entered in favor of the Plaintiffs and Plaintiff-Intervenor declaring that the following categories of land within the original 1858 treaty boundaries of the Yankton Sioux Reservation remain part of the reservation and are Indian country under 18 U.S.C. § 1151(a):

a) land reserved to the federal government in the Act of Aug. 15, 1894, Ch. 290, 28 Stat. 286, 314-19, and then returned to the Yankton Sioux Tribe;

b) land allotted to individual Indians that remains held in trust;

c) land taken into trust under the Indian Reorganization Act of 1934, ch. 576, 48 Stat. 984 (1934) (codified as amended at 25 U.S.C. §§ 461-77); and

d) Indian owned fee land that has continuously been held in Indian hands.

2.    That, other than the declaratory relief granted in paragraph 1 above, all of Plaintiffs', Plaintiff-Intervenor's and Defendants' claims asserted in this action as to the boundaries of the Yankton Sioux Reservation are denied.

Dated this 19th day of December, 2007.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK
BY
(SEAL)    DEPUTY

26